Henry SCHEIN, Inc., Easy Dental Systems, Inc., and Dentisoft, Inc., Petitioners,

v.

Shelly E. STROMBOE, D.D.S., Alan B. Helig, D.D.S., Bart Presti, D.D.S., Kelly Presti, and Jeanne N. Taylor, D.D.S. on behalf of themselves and all other similarly situated, Respondents.

No. 00–1162.

Supreme Court of Texas.

Argued on Feb. 6, 2002.

Delivered Oct. 31, 2002.

Rehearing Denied May 8, 2003.

Christopher Blair Dancy, E. Lee Parsley, Austin, Kirsten M. Castaneda, Jerry K. Clements, Cynthia Keely Timms, Dallas, Locke Liddell & Sapp, LLP, Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, Harry M. Reasoner, Charles W. Schwartz, Vinson & Elkins, Houston, for petitioners.

Joe K. Longley, Philip K. Maxwell, Longley & Maxwell, Donald R. Taylor, Karen Crook Burgess, Bruce Emory Garlick, David E. Dunham, Taylor & Dunham, Austin, for respondents.

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice JEFFERSON, and Justice RODRIGUEZ joined.

Under Rule 42(b)(4) of the Texas Rules of Civil Procedure, the district court certified a nationwide class of some 20,000 purchasers of three dental practice management software products. There are members of this class in all fifty states. The five named plaintiffs and their counsel allege that the software was defective and was sold under false pretenses on which buyers relied. Some of the causes of action they assert are breach of contract, breach of express and implied warranties, fraudulent and negligent misrepresentations, and violations of the Texas Deceptive Trade Practices—Consumer Protection Act.[1] They claim actual, special, consequential, exemplary, and statutory damages, as well as restitution of all amounts paid—up to $74,000 per purchas-

---

1. Tex. Bus. & Com.Code §§ 17.41–.63.

er, or $1.48 billion overall. The district court determined to adjudicate all of these claims, including those of out-of-state purchasers, under Texas law. On interlocutory appeal, the court of appeals affirmed.[2] We conclude that the representative plaintiffs have failed to demonstrate, as Rule 42(b)(4) requires they must, "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[3] Accordingly, we decertify the class and remand the case to the district court for further proceedings.

## I

Henry Schein, Inc. and two subsidiaries, Easy Dental Systems, Inc. and Dentisoft, Inc. (together, "Schein"), produced and marketed three office management software applications for dental practices, one DOS-based, "Easy Dental", and two Windows-based, "Easy Dental for Windows" and "Easy Dental Lite". Shelly E. Stromboe, D.D.S., a purchaser of the Windows software, and Jeanne N. Taylor, D.D.S., a purchaser of the DOS software, sued Schein on behalf of themselves and a class of all purchasers of the software in the nation. (Taylor has been joined by Alan B. Helig, D.D.S., Bart Presti, D.D.S., and Presti's wife and office manager, Kelly Presti, to whom we refer together as "Taylor".) Stromboe and Taylor have filed separate petitions in the trial court.

Stromboe's petition alleges that in the process of opening her own dental office, she contacted Schein for advice about what management software program would be best for her. "In reliance on Schein's recommendation," Stromboe alleges, she selected "Easy Dental Lite". When she tried to use the software, she says, she found that

[t]he program had numerous defects, some of which included: (a) inability to add a new insurance carrier; (b) inability to properly print a fee list; (c) inability to delete accounts; (d) inability to activate or inactivate a patient account; (e) continual operating errors; (f) inability to completely delete an appointment, replacing an appointment with another patient's; (h) [sic] inability to add emergency information on a new patient; (i) inability to properly credit accounts on the accounting software; (j) inadequate space to fill in a treatment plan; (k) Electronic Claims processing problems; ($l$) production of error messages on the computer; (m) inability to save patient notes; (n) multiple inconveniences; ($o$) inability to properly age accounts receivable; and (p) a total lack of multi-tasking capabilities.

Stromboe contends that she complained to Schein, who admitted that the software was defective but "steered" her to its more expensive product, "Easy Dental for Windows", which she purchased. Stromboe alleges that she

was required to have all of her data converted for the new program. In doing so, she lost time, records and production. Easy Dental for Windows also had bugs and defects which corrupted Plaintiff's data and made the system inoperable.

Stromboe's petition asserts the following causes of action:

- breach of contract;
- breach of express warranties—specifically, that "[d]efendants represented to

**2.** 28 S.W.3d 196.

**3.** Tex.R. Civ. P. 42(b)(4).

Plaintiff Stromboe that its practice management software systems and products would satisfy Plaintiff's computer system and software needs to effectively manage and run a dental practice";

- breach of implied warranties—specifically, merchantability;[4]
- fraudulent misrepresentations which "Plaintiff Stromboe and the Windows Class have relied on ... to their damage, unaware of the false and misleading nature of the information provided to them by Defendants"—specifically including that the software: "is a 'Comprehensive Practice' manager"; "has ease of use"; "is a 'state of the art' dental practice management program"; "is the perfect software to help organize your office"; "is an excellent entry level system"; "has a functional patient feature"; "has a functional appointment scheduler"; "has a functional Electronic Claims process"; "has a functional fee schedule feature"; "has a functional accounts receivable and accounting feature"; "runs seamlessly on Windows 95 and other systems"; and "can function effectively in networking and multi-tasking environments";
- negligent misrepresentations on which "Plaintiff Stromboe and the Windows Class relied ... and have been damaged as a result"—specifically including all of the misrepresentations alleged to have been fraudulent;
- promissory estoppel—that "(a) Defendants made promises; (b) it was foreseeable that Plaintiff Stromboe and the Windows Class would rely on Defendants' promises; and (c) Plaintiff Stromboe and the Windows Class substantially relied on these promises to their detriment";

- DTPA violations—specifically, by:
 - "(a) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (b) causing confusion or misunderstanding as to affiliation, connection, or association with or certification by another; (c) representing that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have; (d) representing the goods or services or of a particular standard quality or grade when they were of another; (e) advertising goods or services with intent not to sell them as advertised; (g) [sic] making false and misleading statements of fact concerning the reason for existence of or amount of price reductions; (h) representing that services had been performed when services were not performed; (i) failing to disclose information concerning goods or services that was known at the time of the transaction and with the intent to induce a consumer into a transaction which the consumer would not have entered into had the information been disclosed; and (j) representing an agreement confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law";[5]

 - engaging in an unconscionable action or course of action,[6] defined by statute as "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree";[7] and

---

4. *See* TEX. BUS. & COM.CODE § 2.314.

5. *See id.* §§ 17.46(b)(2), (3), (5), (7), (9), (11), (12), (22), (24); § 17.50(a)(1).

6. *Id.* § 17.50(a)(3).

7. *See id.* § 17.45(5).

- breaching express and implied warranties;[8] and

- unjust enrichment.

Stromboe's petition alleges damages as follows:

As a result of the actions described herein, Defendants are liable to Plaintiff Stromboe and the Windows Class and the other Class members for actual and exemplary damages under common law for Defendants' breach of contract, fraud, constructive fraud, fraud in the inducement, negligent misrepresentation and promissory estoppel.

Plaintiff Stromboe also seeks to recover for herself and other Windows Class members actual damages incurred as a result of Defendants' unlawful practices and false, misleading and deceptive acts or practices under the DTPA. All of these acts were committed knowingly and/or intentionally and Plaintiff Stromboe and the other Windows Class members are entitled to recover additional damages of not more than three (3) times the amount of actual damages under the DTPA.

The damages sought herein for each individual Plaintiff and each individual member of the Windows Class, including interest, attorney's fees, costs, actual and additional damages and exemplary damages, are less than $74,000.00. It is the specific intention of Plaintiff Stromboe and all other Windows Class members to keep all claims for relief, including all damages, pre-judgment interest, post-judgment interest, attorney's fees (when calculated on a per capita basis) and other costs and expenses below the minimum jurisdictional limit for diversity jurisdiction of the United States District Court.

In the prayer of the petition, Stromboe requests for herself and all class members "actual, special and consequential damages, including attorney's fees", "exemplary damages", "actual damages" caused by the DTPA violations, "additional damages" under the DTPA, and "restitution of all money or property that Defendants have collected from Plaintiff Stromboe and the Windows Class".

Finally, Stromboe's petition alleges that

[a] class action is an appropriate vehicle for relief in this case [because] ... there is a well-defined community of interest in the questions of law or fact affecting the Class that predominates over any questions affecting only individual members, including: (i) whether Defendants engaged in deceptive acts and practices in selling and guaranteeing software products and support services to Plaintiff Stromboe and members of the Windows Class through misrepresentations and deceit; (ii) whether Defendants caused Plaintiff Stromboe and members of the Windows Class to rely upon false or misleading information and enter into contracts with Defendants; (iii) whether Defendants breached the contracts entered into with Plaintiff Stromboe and members of the Windows Class; (iv) whether Plaintiff Stromboe and members of the Windows Class have sustained damages, and the proper measure of any damages; (v) whether Defendants' products have defects common to all users of said products; and (vi) whether Defendants' common marketing strategy has perpetuated a fraud on the public.

Taylor's petition alleges that the four named plaintiffs each purchased Schein's DOS software, "Easy Dental", "upon Defendant's representation that they would

---

8. *Id.* § 17.50(a)(2).

have free, unlimited technical support." The petition continues:

> After Plaintiffs purchased the DOS software, Defendants informed each of these Plaintiffs that, contrary to the original representations made in the marketing literature, they would no longer support the software with technical support unless a new version was purchased. Further, Defendants started to charge for technical support that had been represented to be free and unlimited. Such conduct constitutes an unconscionable action or course of action with respect to marketing Easy Dental for DOS. Defendants used coercion to try to force Plaintiffs to purchase unlimited technical support ("Easy Dental Connection") and contrary to their original representations, arbitrarily refused to provide them further support for the original programs they purchased.

> It is Defendants' business practice to send its customers unsolicited upgrades, enhancements and additional products such as software and charge them for such upgrades, enhancement and additional products if such products are not returned. For example, Defendants sent Plaintiffs several versions of software and/or updates and instructed them, as well as other members of the DOS Class, to return this software in order to avoid being charged for the full purchase. Such a business practice violates the DTPA, §§ 35.42 and 35.45 of the Texas Business & Commerce Code and constitutes a breach of contract.

Taylor's petition asserts the following causes of action:

- breach of contract;
- breach of express warranties (none specified);
- breach of implied warranties (none specified);
- fraudulent representations or omissions which "Plaintiffs and the DOS Class have relied on ... to their damage"—specifically, that "Defendants have charged Plaintiffs Taylor, Helig, and the Presti's, and the DOS Class for technical support knowing that they had represented technical support was to be free and unlimited";
- negligent misrepresentations which "Plaintiffs and the DOS Class relied on ... and have been damaged as a result"—specifically, the misrepresentation alleged to have been fraudulent;
- promissory estoppel—that "(a) Defendants made promises; (b) it was foreseeable that Plaintiffs and the Class would rely on Defendants' promises; and (c) Plaintiffs and the Class substantially relied on these promises to their detriment";
- DTPA violations—specifically, by:
 - "(a) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (b) causing confusion or misunderstanding as to affiliation, connection, or association with or certification by another; (c) representing that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have; (d) representing the goods or services or of a particular standard quality or grade when they were of another; (e) advertising goods or services with the intent not to sell them as advertised; (f) failing to disclose information concerning goods or services that was known at the time of the transaction and with the intent to induce a consumer into a transaction which the consumer would not have entered into had the information been disclosed; and (g) representing that an agreement confers or involves rights, reme-

dies or obligations which it does not have or involve, or which are prohibited by law";[9]

- engaging in an unconscionable action or course of action;[10] and
- breaching express and implied warranties;[11] and
- Texas Unsolicited Goods Statute.[12]

The damage allegations in Taylor's petition are essentially identical to those in Stromboe's petition. The reasons Taylor asserts for maintaining the action on behalf of a class are also the same, except that Taylor does not refer to any defect in the DOS software and instead states that a common question of law or fact is

> whether Defendants' practice of sending upgrades, enhancements and subsequent versions of Defendants' software and other products to Plaintiffs and the Class, unsolicited by Plaintiffs and the Class, violates §§ 35.42 and 35.45, TEX. BUS. & COMM.CODE, and the DTPA.

The hearing on the plaintiffs' motion to certify a class lasted five days. Twenty-two witnesses testified, and over 180 exhibits were admitted in evidence. Regarding the Windows software, plaintiffs offered evidence that it contained a defective database, but there was also evidence, which the trial court credited, that the defect in the software affected its operation in different ways. Specifically, the trial court found that the operational problems were:

> (i) difficulty installing the software, (ii) difficulty converting the files from a DOS environment to a Windows environment, (iii) instability and locking-up, (iv) account statements failing to balance, (v) difficulties printing reports and

insurance claims, (vi) data corruption, (vii) confusing or losing patient histories and other transactions, and/or (viii) slow processing.

In other words, problems ranged from the failure of bells-and-whistles performance to basic disfunctions. There was evidence that the software worked with fewer problems in certain environments and on certain equipment, although there was also evidence that it was not fit for the purpose of providing automated practice solutions for dentists and that all purchasers complained to Schein. Regarding the DOS software, the undisputed evidence was that Schein promised or advertised over certain periods of time that it would provide free, unlimited technical support and did not make good on that promise, but during other time periods it promised free technical support only on certain conditions or not at all. As for Schein's sending upgrades and other products unsolicited, some purchasers' license agreements expressly permitted that and others did not.

The trial court certified two subclasses, one of 5,000 Windows software purchasers, and the other of 15,000 DOS software purchasers. In its order it found that "[i]n light of the amount any individual Plaintiff could recover in this case"—an amount the court did not determine but which Stromboe and Taylor pleaded would not exceed $74,000—"and the fact that Plaintiffs are owners and operators of small businesses, . . . the economics of pursuing their claims individually would not be feasible". Among the common questions of fact the court identified for the Windows class were whether members experienced any of the operational problems it had listed; whether advertisements and other commu-

---

**9.** *See id.* §§ 17.46(b)(2), (3), (5), (7), (9), (12), (24); 17.50(a)(1).

**10.** *Id.* §§ 17.45(5), 17.50(a)(3).

**11.** *Id.* § 17.50(a)(2).

**12.** *See id.* §§ 35.42, 35.45.

nications were false, misleading, or deceptive; whether class members received the benefit of their bargain; and whether they suffered damages in reliance on Schein's misrepresentations. Among the common questions of fact the court identified for the DOS class were whether misrepresentations were made; whether class members failed to receive the benefit of their bargain because they did not receive free technical support; whether they relied on and suffered damages from any misrepresentations; and whether they received unsolicited upgrades. But there was no evidence that all purchasers relied on the same or even similar representations by Schein—some, for example, bought at the recommendation of friends and colleagues—or that they suffered problems of the same magnitude or incurred the same damages.

The court also found in its order that questions of law regarding essentially all of the legal theories asserted by Stromboe and Taylor were common to the class. Because class members reside in all fifty states, Schein offered evidence of the differences in state law that might apply to different class members. The trial court determined that Texas law would apply to all claims by all members because (1) all of the Windows software license agreements and some of the DOS software license agreements chose Texas law as the governing law, and (2) the software was designed, developed, programmed, and manufactured in Dallas, shipped from there, and partially marketed there. The court did not explain why either of these factors supported application of Texas law to class members' claims for breach of implied warranties, fraud, negligent misrepresentation, and violations of consumer protection statutes.

The trial court's order summarized its conclusions as follows:

The Court further finds that both the requirements in Texas Rules of Civil Procedure Rule 42(b)(1) and (4) met [sic] in the present case. Unless this case is certified, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants. Since Defendants have sold software all across the country, the only way to individually adjudicate the claims of the class members in this case would be to impanel juries in every state. The risk of varying adjudications would be present, with no clear standard of conduct created for Defendants. Here, all claims for both classes are governed by Texas law.

In addition, the Court finds that the questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for a fair and efficient adjudication of the controversy. The court and the litigants in this case will concentrate most of their efforts on the common issues.

The court did not explain how it expected to try the case, other than to say:

There are no insurmountable difficulties likely to be encountered in the management of this case, including the management of damage issues. It may be possible to determine damages on a class wide basis from Defendants' records, but if that cannot be done, the Court finds nothing to indicate that damages could not be efficiently determined through proof of claim forms, individual damage hearings, or other manageable means. Because this is a contract action an opt out class is appropriate.

Schein took an interlocutory appeal from the trial court's certification order.[13] Noting that "[t]rial courts enjoy broad discretion in deciding whether to grant or deny a motion for class certification",[14] the court of appeals stated that it would "view the evidence in the light most favorable to the trial court's action and entertain every presumption in favor of its judgment."[15] The court recognized that our opinion in *Southwestern Refining Co. v. Bernal* requires "that courts perform a 'rigorous analysis' before ruling on a motion for class certification so as to ensure that all of the prerequisites have been met."[16] The court observed that the trial court had been diligent in conducting a lengthy hearing on the plaintiffs' motion to certify the class, that the trial court had identified many common factual and legal issues, and that the evidence offered at the hearing showed that issues regarding Schein's conduct and the nature of its software would be common to the claims of all of the class members.

Regarding issues related to the individual class members, however, the court of appeals was something less than definite. Although the court stressed four times that the plaintiffs' "primary measure of damages" was "the benefit of their bargain" or "disgorgement of the amounts

they paid",[17] which could be determined from Schein's own records,[18] regarding the plaintiffs' other claims of actual damages, the court said only:

> While we recognize that there may be other sources of consequential damages, the mere fact that some damages may have to be computed separately for different class members does not preclude class certification. As the trial court noted in its findings of fact and conclusions of law, these damages may be efficiently determined through proof-of-claim forms, individual damage hearings, or other manageable means. Consequently, we are confident that any individual damages issues may be resolved in a "manageable, time-efficient, yet fair manner."[19]

Concerning exemplary damages, the court said only that they "may be resolved by asking a jury whether Easy Dental committed the alleged actions *knowingly*, if at all."[20] The court did not explain how a jury would be able to take into account, as it must, the actual damages determined by various means in assessing punitive damages.[21]

The court of appeals was equally dismissive of Schein's argument that reliance is not a common issue but must necessari-

---

13. TEX. CIV. PRAC. & REM.CODE § 51.014(a)(3).

14. 28 S.W.3d 196, 200.

15. *Id.* at 201.

16. *Id.* at 201 (citing *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 439 (Tex.2000)).

17. *Id.* at 206 ("As their primary measure of damages, the class members seek the benefit of their bargain and exemplary damages pursuant to liability under the DTPA."); *id.* ("appellees seek as their primary measure of damages the disgorgement of the amounts they paid Easy Dental for the software"); *id.* at 206–207 ("appellees seek disgorgement of the

software's purchase price as their primary measure of damages for breach of contract"); *id.* at 207 ("Finally, we reiterate that the primary measure of damages appellees seek is disgorgement of the software's purchase price.").

18. *Id.* at 206.

19. *Id.* at 207 (citations omitted) (quoting *Bernal*, 22 S.W.3d at 436).

20. *Id.* at 206.

21. *Bernal*, 22 S.W.3d at 432; *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 30 (Tex. 1994).

ly be determined for each individual plaintiff. "First," the court said, "we point out that the issue of reliance is relevant only in regard to appellees' claims for common-law fraud."[22] That, of course, is simply not true. Reliance is also not only relevant to, but an element of proof of, plaintiffs' claims of breach of express warranty (to a certain extent),[23] negligent misrepresentation,[24] promissory estoppel,[25] and DTPA "laundry-list" violations.[26] The court of appeals then added that "in practical effect, the common-law fraud allegation in this case is ancillary to and subsumed by appellees' DTPA claim"[27] because plaintiffs alleged both theories "solely for the purpose of recovering exemplary damages, [and therefore] reliance is not a critical issue in this case."[28] The court's point is difficult to understand, given that both the standards for and the limits on recovery of exemplary damages for fraud and recovery of additional damages for DTPA violations are very different.[29]

The court of appeals noted that the misrepresentations Schein is alleged to have made were substantially similar, regard-

22. 28 S.W.3d at 206.

23. *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 436 (Tex.1997) ("At the outset, we recognize that the fraud, fraudulent concealment, negligent misrepresentation, and express warranty claims all share the common element of reliance.... Though not a fraud-based claim, an express warranty claim also requires a form of reliance. The Uniform Commercial Code provides that an express warranty is created when '[a]ny affirmation of fact or promise [is] made by the seller to the buyer which relates to the goods and becomes part of the *basis of the bargain.'* Tex. Bus. & Com.Code § 2.313(a)(1) (emphasis added). 'Basis of the bargain' loosely reflects the common-law express warranty requirement of reliance." (citing in part *Southwestern Bell Tel. Co. v. FDP Corp.,* 811 S.W.2d 572, 575 & n. 2 (Tex.1991), and *Shamrock Fuel & Oil Sales Co. v. Tunks,* 416 S.W.2d 779, 786 (Tex. 1967))).

24. *Federal Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991) ("The elements of a cause of action for [negligent misrepresentation] are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.").

25. *English v. Fischer,* 660 S.W.2d 521, 524 (Tex.1983) ("The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment.").

26. Tex. Bus. & Com.Code § 17.50(a)(1) ("A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish: (1) the use or employment by any person of a false, misleading, or deceptive act or practice that is: (A) specifically enumerated in a subdivision of Subsection (b) of Section 17.46 of this subchapter; and (B) relied on by a consumer to the consumer's detriment....").

27. 28 S.W.3d at 206.

28. *Id.* at 207.

29. *Compare* Tex. Civ. Prac. & Rem.Code §§ 41.003 (requiring proof of exemplary damages for fraud by clear and convincing evidence), 41.008 (limiting exemplary damages to the greater of either $200,000 or two times economic damages plus noneconomic damages found by the jury, not to exceed $750,000), *with* Tex. Bus. & Com.Code § 17.50(b)(1) (requiring that a defendant be found to have acted knowingly or intentionally for additional damages to be awarded, and limiting such damages to three times economic damages if the defendant acted knowingly, and three times mental anguish and economic damages in the defendant acted intentionally).

less of how they were communicated,[30] but it appears from the evidence that not all class members heard or relied upon any such misrepresentations in purchasing software. The court did not explain how the issue of whether misrepresentations were communicated to individual plaintiffs could be tried manageably in a class action.

Finally, the court considered what law should apply to the plaintiffs' claims. The court acknowledged that under Texas law " '[t]he rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles listed in [section 6 of the *Restatement (Second) of Conflict of Laws*].' "[31] The court then concluded, as the trial court had, that the plaintiffs' action for breach of contract is governed by Texas law because all of the licensing agreements for the Windows software and some for the DOS software provided that disputes would be determined by Texas law, and because the software was "designed, developed, programmed, manufactured, and shipped from Dallas, Texas."[32] Regarding the plaintiffs' several other claims, the court said:

> we remain mindful that appellees' tort-related claims are clearly derivative of,

and completely interrelated with, their claims for breach of contract. Thus, we apply much the same analysis [as we have for the breach of contract claim]. Upon considering all the relevant factors and policy considerations, we conclude that Texas law should likewise apply to the plaintiffs' remaining tort-related causes of action, all of which arise out of the parties' contractual relationships.[33]

Schein petitioned this Court for review. We first dismissed the petition for want of jurisdiction[34] but on motion for rehearing, we granted it.[35]

## II

This Court has jurisdiction over an interlocutory appeal from an order certifying a class action when the court of appeals "holds differently from a prior decision of another court of appeals or of the supreme court".[36] As the Court has reiterated, two decisions "hold differently" or conflict when "the rulings in the two cases are 'so far upon the same state of facts that the decision of one case is necessarily conclusive of the decision in the other.' "[37] "The conflict must be on the very question of law actually involved and determined, in respect of an issue in both cases, the test being whether one would operate to overrule the other in case they were both

---

30. 28 S.W.3d at 207.

31. *Id.* at 208 (citing *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53 (Tex. 1991) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1) (1971))).

32. *Id.* at 208–209.

33. *Id.* at 209.

34. 44 Tex. Sup.Ct. J. 1070 (Aug. 23, 2001).

35. 45 Tex. Sup.Ct. J. 77 (Nov. 8, 2001).

36. TEX. GOV'T CODE §§ 22.225(b)(3), (c); 22.001(a)(2).

37. *Christy v. Williams*, 156 Tex. 555, 298 S.W.2d 565, 567 (1957) (quoting *Dockum v. Mercury Ins. Co.*, 134 Tex. 437, 135 S.W.2d 700, 701 (1940)); *accord, e.g., Texas Natural Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 867 (Tex.2001); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 551 (Tex. 2000); *Southwestern Refining Co. v. Bernal*, 22 S.W.3d 425, 430 (Tex.2000); *Coastal Corp. v. Garza*, 979 S.W.2d 318, 319 (Tex.1998); *Gonzalez v. Avalos*, 907 S.W.2d 443, 444 (Tex. 1995).

rendered by the same court."[38] Factual differences in cases do not preclude their being in conflict if the differences do not distinguish "the legal principle being announced."[39]

Schein argues that the court of appeals' decision conflicts in two respects with ours in *Southwestern Refining Co. v. Bernal.*[40] For reasons we explain, we agree.

## A

■ In *Bernal,* we held that

it is improper to certify a class without knowing how the claims can and will likely be tried. A trial court's certification order must indicate how the claims will likely be tried so that conformance with Rule 42 may be meaningfully evaluated. "Given the plaintiffs' burden, a court cannot rely on [mere] assurances of counsel that any problems with predominance or superiority can be overcome."[41]

Schein argues that the court of appeals failed to hold the trial court's certification order to this standard. We agree.

The court of appeals acknowledged our admonitions in *Bernal* that " 'a cautious approach to class certification is essential,' "[42] that " '[i]f it is not determinable from the outset that the individual issues can be considered in a manageable, time-efficient, yet fair manner, then certification is not appropriate,' "[43] and that trial courts must perform a " 'rigorous analysis' " of

these matters before certifying a class.[44] To conclude that the trial court's order satisfied *Bernal's* requirements, the court of appeals reasoned that the certification hearing was lengthy,[45] the trial court identified a number of factual and legal issues common to class members,[46] disgorgement of amounts paid was the plaintiffs' "primary measure of damages" and could be proved from Schein's records, "reliance [was] not a critical issue" because it was not relevant to the plaintiffs' DTPA claims,[47] and proof of consequential and other damages was manageable.[48] It is true, of course, that the trial court conducted a lengthy hearing and identified several common legal and factual issues, but the remainder of the court of appeals' analysis is flawed. Even if the court were correct that the plaintiffs' primary action is for breach of contract and their primary damage claim disgorgement—and it is far from clear to us that this is an accurate assessment of the plaintiffs' contentions—the plaintiffs have not abandoned their other actions and damage claims, and there is nothing in the trial court's order or the court of appeals' opinion to indicate how these other issues are to be tried. Nor have the plaintiffs been able to suggest to us how, specifically, the actions and claims they have pleaded can be tried.

■ The plaintiffs argue that the court of appeals' decision does not conflict with *Bernal* because the court did not refuse to

---

38. *Christy,* 298 S.W.2d at 568–569 (citation omitted).

39. *Coastal Corp.,* 979 S.W.2d at 320.

40. 22 S.W.3d 425, 430 (Tex.2000).

41. 22 S.W.3d at 435 (citing and quoting *Castano v. American Tobacco Co.,* 84 F.3d 734, 742, 744 (5th Cir.1996)).

42. 28 S.W.3d at 204 (quoting *Bernal,* 22 S.W.3d at 435).

43. *Id.*

44. *Id.*

45. 28 S.W.3d at 204.

46. *Id.* at 204–205.

47. *Id.* at 206–207.

48. *Id.* at 207.

follow our opinion. But outspoken disagreement is not necessary to invoke our conflicts jurisdiction. Lower courts are bound to follow this Court's decisions, and a court's express refusal to do so is exceedingly rare. What is required for conflict jurisdiction is that the two decisions cannot stand together. For example, last Term in *Texas Department of Transportation v. Ramirez*[49] we concluded that the court of appeals' decision[50] conflicted with our decision in *State v. Rodriguez.*[51] In *Rodriguez*, the plaintiffs alleged that a "detour was unreasonably dangerous and had inadequate warning signs."[52] We held that "[d]esign of any public work, such as a roadway, is a discretionary function involving many policy decisions, and the governmental entity responsible may not be sued for such decisions."[53] "Under section 101.056 [of the Texas Tort Claims Act[54]]," we concluded, "the State retained its immunity for the detour design because the design was a discretionary act."[55] Accordingly, we held that summary judgment for the State was proper. In *Ramirez*, the plaintiffs alleged that a highway median was defectively designed.[56] The court of appeals cited *Rodriguez* and essentially quoted its holding: "Design of a public work, such as a state highway, is generally a discretionary function that involves numerous policy decisions, including what type of safety features to install."[57] But the court of appeals affirmed the trial court's denial of the State's plea to the jurisdiction because it concluded that the plaintiffs might be able to amend their pleadings to state a cause of action not barred by immunity.[58] We held that the court of appeals' refusal to dismiss the case altogether conflicted with our decision in *Rodriguez.*[59] That conflict did not disappear simply because the court of appeals asserted that it was following Rodriguez.

Here, as in *Ramirez*, the court of appeals correctly stated the law but misapplied it. In *Bernal*, the trial court actually formulated a plan for the trial of the case, setting out the issues and the order in which they would proceed.[60] We concluded that that plan was deficient. The trial court in the present case, unaided by our opinion in *Bernal* which had not yet issued, did far less. It would not be possible, applying the same standards, to reverse the certification order in *Bernal* and affirm the order in the present case.

▮ The plaintiffs argue correctly that *Bernal* should not be read to require a "trial plan" by that name, set out in a separate document. Rule 42 does not require adoption of a trial plan as a mere formality; rather, according to *Bernal*, the rule requires a rigorous analysis and a specific explanation of how class claims are to proceed to trial. Here, the trial court concluded only:

> There are no insurmountable difficulties likely to be encountered in the management of this case, including the man-

---

**49.** 74 S.W.3d 864 (Tex.2002) (per curiam).

**50.** 72 S.W.3d 376 (Tex.App.-Austin 2001), *rev'd*, 74 S.W.3d 864 (Tex.2002) (per curiam).

**51.** 985 S.W.2d 83 (Tex.1999) (per curiam).

**52.** *Id.* at 85.

**53.** *Id.* (citation omitted).

**54.** TEX. CIV. PRAC. & REM.CODE § 101.056.

**55.** 985 S.W.2d at 86 (citations omitted).

**56.** *Ramirez,* 74 S.W.3d at 866.

**57.** *Ramirez,* 72 S.W.3d at 384 n. 6.

**58.** *Id.* at 385.

**59.** *Ramirez,* 74 S.W.3d at 866.

**60.** *Bernal,* 22 S.W.3d at 429.

agement of damage issues. It may be possible to determine damages on a class wide basis from Defendants' records, but if that cannot be done, the Court finds nothing to indicate that damages could not be efficiently determined through proof of claim forms, individual damage hearings, or other manageable means.

The court of appeals' conclusion that the certification order is proper conflicts with *Bernal.*

**B**

We also held in *Bernal:*

The predominance requirement [of Rule 42(b)(4) ] is intended to prevent class action litigation when the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses. But the predominance requirement has not always been so rigorously applied. When presented with significant individual issues, some courts have simply remarked that creative means may be designed to deal with them, without identifying those means or considering whether they would vitiate the parties' ability to present viable claims or defenses. *Other courts have indulged every presumption in favor of the trial court's ruling, viewed the evidence in the light most favorable to that ruling,* and frankly acknowledged that if they erred, it would be in favor of certification. Still others have postulated that because a settlement or a verdict for the defendant on the common issues could end the litigation before any individual issues would be raised, predominance need not be evaluated until later. Other courts have suggested that the

predominance requirement is not really a preliminary requirement at all because a class can always later be decertified if individual issues are not ultimately resolved.

*We reject this approach* of certify now and worry later. . . .

Courts must perform a "rigorous analysis" before ruling on class certification to determine whether all prerequisites to certification have been met. Although it may not be an abuse of discretion to certify a class that could later fail, we conclude that a cautious approach to class certification is essential. The "flexibility" of Rule 42 "enhances the usefulness of the class-action device, [but] *actual, not presumed, conformance with [the Rule] remains . . . indispensable."* [61]

In the present case, the court of appeals stated:

In our review of the trial court's decision, we view the evidence in the light most favorable to the trial court's action and entertain every presumption in favor of its judgment. [62]

Schein argues that the court of appeals' standard of review, both as stated and as applied, conflicts with the highlighted language in *Bernal.* We agree.

As we have already explained, the trial court did not set out any plan for trying the plaintiffs' claims. The certification order only lists some common issues and simply concludes that there is "nothing to indicate" that individual claims cannot be managed. Reviewing this portion of the certification order, the court of appeals stated: "we are confident that any individual damages issues may be resolved in a 'manageable, time-efficient, yet fair man-

**61.** 22 S.W.3d at 434–435 (citations omitted, emphasis added).

**62.** 28 S.W.3d at 201 (citations omitted).

ner.' " [63] Similarly, the court of appeals brushed aside arguments that the trial court had not explained how other individual issues, like reliance, and other claims, like fraud, would be tried. *Bernal* does not permit these issues to be a matter of an appellate court's confidence in a trial court's rulings; rather, *Bernal* requires actual, demonstrated compliance with Rule 42.

■ The plaintiffs argue that the court of appeals' reference to "entertain[ing] every presumption in favor" of the trial court merely restated the standard of review for abuse of discretion, but *Bernal* shows that this argument is incorrect. In *Bernal,* we expressly stated that the trial court's decision to certify a class was to be reviewed for an abuse of discretion,[64] but we likewise expressly refused to indulge every presumption in favor of the trial court's ruling. A trial court has discretion to rule on class certification issues, and some of its determinations—like those based on its assessment of the credibility of witnesses, for example—must be given the benefit of the doubt. But the trial court's exercise of discretion cannot be supported by every presumption that can be made in its favor. As we said in *Bernal,* "actual, not presumed, conformance with [the rule] remains ... indispensable." [65] Compliance with Rule 42 must be demonstrated; it cannot merely be presumed. The court of appeals' contrary holding conflicts with *Bernal.*

### III

■ Having thus concluded that we have jurisdiction over this appeal, we turn to the substantive issues raised by the

parties. Schein argues, and the plaintiffs agree, that the trial court erred in certifying a class under Rule 42(b)(1), which requires that

the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.... [66]

Litigation by class members individually may well yield varying results; some may win and some may lose. But the plaintiffs have not shown, nor do they claim to have shown, how the prosecution of individual actions would "establish incompatible standards of conduct" for Schein, dispose as a practical matter of other class members' interests, or "impair or impede" protection of class members' interests. Thus, we agree that the trial court erred in certifying a class under Rule 42(b)(1).

■ The plaintiffs contend, however, and the court of appeals held, that the trial court's error does not require reversal because the plaintiffs are free to abandon that part of the certification order in the course of this appeal and have done so.[67] Schein responds that the plaintiffs cannot abandon part of their claim without the

**63.** 28 S.W.3d at 207.

**64.** *Bernal,* 22 S.W.3d at 439.

**65.** *Id.* at 435.

**66.** Tex.R. Civ. P. 42(b)(1).

**67.** 28 S.W.3d at 202–203.

trial court's approval and notice to the class, citing Rule 42(e), which states:

A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.[68]

Schein argues that the plaintiffs' abandonment on appeal of class claims under Rule 42(b)(1) is tantamount to a dismissal of those claims which cannot be permitted without notice to the class.

■ The purpose of Rule 42(e) is to prevent a significant impairment in class rights by the named plaintiffs or class counsel without court oversight and notice to the class. It may be that an abandonment of viable claims on appeal cannot be distinguished from "dismissal" within the meaning of the rule, but we need not decide that issue today because the same cannot be said of a refusal to press claims wholly without merit. The plaintiffs' concession on appeal of obvious error in the certification of a class under Rule 42(b)(1) should no more trigger the protections of Rule 42(e) than a simple reversal by an appellate court. Under these circumstances, the plaintiffs' concession does not trigger the concerns of Rule 42(e).

However, the court of appeals erred in affirming the certification order in its entirety, including certification under Rule 42(b)(1). The plaintiffs cannot by their concession amend the trial court's order so that it may be affirmed. The court of appeals should have reversed that portion of the order.

## IV

■ Rule 42(a) prescribes the following prerequisites for a class action:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law, or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.[69]

Rule 42(b)(4) provides that:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

(4) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.[70]

Schein argues that the plaintiffs have failed to show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members," as the rule re-

---

**68.** Tex.R. Civ. P. 42(e).

**69.** Tex.R. Civ. P. 42(a).

**70.** Tex.R. Civ. P. 42(b)(4).

quires. Specifically, Schein argues that individual questions regarding reliance, damages, and the applicable law predominate. We examine each of these categories separately and then consider whether, on the whole, the plaintiffs have met their burden under the rule. "The test for predominance is not whether common issues outnumber uncommon issues but ... 'whether common or individual issues will be the object of most of the efforts of the litigants and the court.' " [71]

## A

■■■■■■ As we have noted, reliance is an element of five of the plaintiffs' causes of action: fraud, breach of express warranty (to a certain extent), negligent misrepresentation, promissory estoppel, and DTPA "laundry list violations". The burden on plaintiffs to prove reliance in order to recover on any of these theories is in no way altered by the assertion of claims on behalf of a class. As we stressed in *Bernal*:

The class action is a procedural device intended to advance judicial economy by trying claims together that lend themselves to collective treatment. It is not meant to alter the parties' burdens of proof, right to a jury trial, or the substantive prerequisites to recovery under a given tort. Procedural devices may "not be construed to enlarge or diminish any substantive rights or obligations of any parties to any civil action." TEX.R. CIV. P. 815; *see also* TEX. GOV'T CODE § 22.004(a); *In re Ethyl Corp.*, 975 S.W.2d 606, 613 (Tex.1998) ("The systemic urge to aggregate litigation must not be allowed to trump our dedication to justice, and we must take care that each individual plaintiff's—and defen-

dant's—cause not be lost in the shadow of a towering mass litigation.") (quoting *In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir.1992)). Although a goal of our system is to resolve lawsuits with "great expedition and dispatch and at the least expense," the supreme objective of the courts is "to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." TEX.R. CIV. P. 1. This means that "convenience and economy must yield to a paramount concern for a fair and impartial trial." *In re Ethyl Corp.*, 975 S.W.2d at 613. And basic to the right to a fair trial—indeed, basic to the very essence of the adversarial process—is that each party have the opportunity to adequately and vigorously present any material claims and defenses.[72]

Thus, the 20,000 class members in the present case are held to the same standards of proof of reliance—and for that matter all the other elements of their claims—that they would be required to meet if each sued individually. This does not mean, of course, that reliance or other elements of their causes of action cannot be proved class-wide with evidence generally applicable to all class members; class-wide proof is possible when class-wide evidence exists. But evidence insufficient to prove reliance in a suit by an individual does not become sufficient in a class action simply because there are more plaintiffs. Inescapably individual differences cannot be concealed in a throng. The procedural device of a class action eliminates the necessity of adducing the same evidence over and over again in a multitude of individual

---

**71.** *Bernal,* 22 S.W.3d at 434 (quoting *Central Power & Light Co. v. City of San Juan,* 962 S.W.2d 602, 610 (Tex.App.-Corpus Christi 1998, writ dism'd w.o.j.)).

**72.** 22 S.W.3d at 437.

actions; it does not lessen the quality of evidence required in an individual action or relax substantive burdens of proof. If a plaintiff could prove reliance in an individual action with the same evidence offered to show class-wide reliance, then the issue is one of law and fact common to the class. The question the court must decide before certifying a class, after rigorous analysis and not merely a lick and a prayer, is whether the plaintiffs have demonstrated that they can meet their burden of proof in such a way that common issues predominate over individual ones.

The plaintiffs contend that they have established "class-wide reliance" on misrepresentations made by Schein, but this is not supported by the record. It is true, as the plaintiffs say, that there is evidence that Schein *wanted* purchasers to rely on its advertisements and other representations about its software products, as most marketers of any product would, but there is no evidence that purchasers *actually did* rely on Schein's statements so uniformly that common issues of reliance predominate over individual issues. To the contrary, there is, for example, significant evidence that purchasers relied on recommendations from colleagues and others rather than any statements made directly or indirectly by Schein. The trial court did not explain in its certification order how the plaintiffs can avoid individual proof of reliance or why the necessity for such proof would not defeat the predominance requirement for certification. Such an explanation would be an important part of the trial plan required by *Bernal.* The court of appeals premised affirmance of the order on the mistaken belief that reliance was not an element of the plaintiffs' principal causes of action.

The Fifth Circuit has recently observed that if "individual reliance is necessary to

prove actual damages, a class action may not be certified on this issue." [73] We need not and do not decide whether a class asserting a cause of action requiring proof of reliance, like the class alleged here, can ever be certified. We hold only that the plaintiffs in this case have failed to show that individual issues of reliance do not preclude the necessary finding of predominance under Rule 42(b)(4).

**B**

■■ Again as already noted, the plaintiffs claim a number of different types of damages. There is evidence that their claim for restitution of amounts paid could be proved by Schein's records or by checks, charge slips, receipts, or other evidence of payment. It appears from the record that the determination of such amounts would be common to the class and would not require individual examination of class members except in unusual instances.

But the same is not true for the plaintiffs' other damage claims. Consequential damages, for one, would obviously have to be determined class member by class member. Stromboe, for example, alleges that she "lost time, records and production". Unlike the restitution of amounts paid, the value of that loss cannot readily be ascertained, and Schein would be entitled to cross-examine her on the subject. The plaintiffs do not argue otherwise, nor do they appear to contend that an individual determination of consequential damages would be manageable. Rather, the plaintiffs now say on appeal that they are simply willing to forego their claims for consequential damages. They have not, however, amended their pleadings to strike that claim, and it is not clear that they could readily do so. Such an amend-

---

**73.** *Perrone v. General Motors Acceptance* *Corp.,* 232 F.3d 433, 440 (5th Cir.2000).

ment would be a dismissal of significant, viable claims of which potential class members may be entitled to notice under Rule 42(e).[74] Moreover, it is not clear that a class action is superior, another requirement of Rule 42(b)(4), if it necessitates that plaintiffs give up substantial rights, nor is it clear that the willingness of the five named plaintiffs to forego consequential damages is typical of the other 20,000 class members. The plaintiffs have failed to show how common issues predominate if consequential damages are to be proved, and whether a class excluding consequential damage claims could or should be certified was not explored in the trial court. Accordingly we cannot determine how they affect the question of certification.

Even if the plaintiffs could and would concede individual consequential damages without impairing the superiority of a class action, they have given no indication that they would also be willing to concede exemplary or statutory damages. The plaintiffs argue that exemplary or statutory damages can be proved without regard to individual claimants, but they have not shown how this can be done. By statute, as it pertains to this case, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm *with respect to which the claimant seeks recovery* of exemplary damages results from ... fraud [or] malice...."[75] Fraud, as we have said, requires proof of reliance. Malice, as defined by statute, requires proof either of specific intent or of an extreme degree of risk and a subjective awareness of it at the time.[76] In each instance, class-wide proof

may be possible; it is certainly not necessary that the plaintiffs show that Schein harbored malice toward each individual class member one-on-one. But the plaintiffs here have failed to show how proof of malice can be made outside the context of class members' individual circumstances over time. The defendants' circumstances, too, may have varied over the relevant periods. Recovery of additional damages under the DTPA requires proof that the defendant acted knowingly or intentionally at the time,[77] which again appears to raise individual circumstances. Finally, any finding of the amount of exemplary damages must take into consideration the amount of actual damages.[78] It is not clear to us how exemplary or statutory damages can be determined on a classwide basis or prior to determinations of liability and actual damages.[79]

For all of these reasons, plaintiffs have failed to show that common fact questions regarding damages predominate.

### C

■ The lower courts determined that common legal questions predominate because all of the plaintiffs' claims should be governed by Texas law. Class members who live in states whose laws do not cap exemplary or statutory damages or require proof by clear and convincing evidence must suffer the limits imposed by Texas law, and class members whose states do not allow recovery of exemplary damages in these circumstances will get a benefit here that their own domicile does not confer. Class members who live in states with consumer protection laws that

---

74. *See, e.g., Diaz v. Trust Territory of Pacific Islands,* 876 F.2d 1401 (9th Cir.1989).

75. Tex. Civ. Prac. & Rem.Code § 41.003(a) (emphasis added).

76. *Id.* § 41.001(7).

77. Tex. Bus. & Com Code § 17.50(b).

78. *Bernal,* 22 S.W.3d at 433.

79. *Id.*

are stronger or different than those in Texas will be deprived of those protections, and those who live in states without such laws will be protected as if they lived in Texas.

The only basis for this decision to apply Texas law to all of the plaintiffs' claims appears to be that those claims are in some sense primarily contractual. The trial court's choice-of-law analysis in its certification order mentions only two factors. One is that all of the Windows software licensing agreements, and some for the DOS products, provided that the agreements would be governed by Texas law. But those purchasers whose agreements did not call for the application of Texas law cannot be bound by agreements they never made. The other factor mentioned in the certification order is that Schein developed, programmed, and manufactured the software in Dallas, shipped it from Dallas, and marketed some of it from there.

 If we assume that the choice-of-law provisions in the licensing agreements are all valid, then Texas law would apply to the claims of many of the class members. As for the class members who did not agree to be governed by Texas law:

> When the parties to a contract ... have not themselves chosen what law is to govern their agreement, section 188(1) of the *Restatement* [*(Second) of Conflict of Laws*] states the general rule: "The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Section 188(2) lists the contacts comprising the rela-

tionship between transaction and locale ordinarily to be taken into account in applying the principles in section 6. These include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

\* \* \*

Section 6 [of the *Restatement*] provides that absent a statutory directive concerning the law to be applied in a case, "the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other. interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." [80]

Thus, class members who have not agreed to be bound by Texas law are not necessarily required to do so merely because Schein is in Texas. As for tort claims, Texas law requires that courts weigh the following factors in determining what law applies:

> "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." [81]

**80.** *Maxus Exploration Co. v. Moran Bros., Inc.*, 817 S.W.2d 50, 53–54 (Tex.1991) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 6, 188 (1971)).

**81.** *Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex.1979) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(2) (1971)).

Schein's presence in Texas is but one factor to be considered in determining the applicable law and does not, by itself, dictate that Texas law will govern the non-contract claims of class members in other states.

Schein offered evidence of the differences in the law of other states, but we do not have the benefit of an analysis of those differences by the lower courts. Accordingly, we are not prepared to say that Texas law will not govern any of the class members' other claims besides those for breach of licensing agreements with choice-of-law provisions. We can say, however, that the plaintiffs have wholly failed to demonstrate that Texas law should apply to so many of those claims that common legal issues predominate.

In a very recent case, *In re Bridgestone/Firestone, Inc.*,[82] the Seventh Circuit faced arguments similar to those before us here. The court reviewed an order certifying two nationwide classes:

the first includes everyone who owns, owned, leases, or leased a Ford Explorer of model year 1991 through 2001 anytime before the first recall, and the second includes all owners and lessees from 1990 until today of Firestone ATX, ATX II, Firehawk ATX, ATX 23 Degree, Widetrack Radial Baja, or Wilderness tire models, or any other Firestone tire "substantially similar" to them.[83]

Class members numbered in the millions and resided in all fifty states.[84] The federal district court, sitting in Indiana, determined that Indiana state courts would apply the law of Michigan to the claims against Ford and the law of Tennessee to the claims against Firestone because the defendants are, respectively, headquartered in those states.[85] The court of appeals assumed that all plaintiffs alleging personal injuries would opt out of the class, and thus the members left would be claiming economic loss as a result of the defective vehicles and tires.[86] The court of appeals rejected the district court's decision to apply Michigan and Tennessee law to all of the class members' claims:

We do not for a second suppose that Indiana would apply Michigan law to an auto sale if Michigan permitted auto companies to conceal defects from customers; nor do we think it likely that Indiana would apply Korean law (no matter *what* Korean law on the subject may provide) to claims of deceit in the sale of Hyundai automobiles, in Indiana, to residents of Indiana, or French law to the sale of cars equipped with Michelin tires.[87]

Instead, the court of appeals concluded that Indiana would apply the law of each class member's residence to all of his claims, contract, tort, and statutory.[88] "Because these claims must be adjudicated under the law of so many jurisdictions," the court concluded, "a single nationwide class is not manageable."[89] And, the court added immediately, even a statewide class could not be certified because of the predominance of individual fact issues regarding liability and damages.[90]

**82.** 288 F.3d 1012 (7th Cir.2002).

**83.** *Id.* at 1015.

**84.** *Id.* at 1016.

**85.** *Id.* at 1015.

**86.** *Id.* at 1016.

**87.** *Id.* at 1018.

**88.** *Id.*

**89.** *Id.*

**90.** *Id.* at 1018–1019.

Texas, like Indiana, does not apply the law of the state where a defendant is headquartered to every claim for economic damages that can be alleged against the defendant. The trial court's contrary conclusion was erroneous. The plaintiffs do not argue that a nationwide class should be certified if the trial court must look to the laws of all fifty states to adjudicate the claims. State[91] and federal[92] courts have

**91.** *Ex parte Exxon Corp.,* 725 So.2d 930, 934 (Ala.1998); *Ex parte Green Tree Fin. Corp.,* 723 So.2d 6, 11 (Ala.1998); *Canon U.S.A., Inc. v. Super. Ct.,* 68 Cal.App.4th 1, 79 Cal. Rptr.2d 897, 902 (1998); *Carr v. GAF, Inc.,* 711 So.2d 802, 807 (La.Ct.App.1998); *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 752 A.2d 200, 231 (2000); *Snell v. Geico Corp.,* No. Civ. 202160, 2001 WL 1085237, at *6, *10–11 (Md.Cir.Ct. Aug. 14, 2001); *Carroll v. Cellco P'ship,* 313 N.J.Super. 488, 713 A.2d 509, 513–16 (App.Div.1998); *Geiger v. Am. Tobacco Co.,* 181 Misc.2d 875, 696 N.Y.S.2d 345, 354 (N.Y.Sup.Ct.1999); *Gordon v. Ford Motor Co.,* 260 A.D.2d 164, 687 N.Y.S.2d 369, 370 (N.Y.App.Div.1999); *Simmons v. Am. Gen. Life & Accident Ins. Co.,* 140 Ohio App.3d 503, 748 N.E.2d 122, 129 (2000); *Duvall v. TRW, Inc.,* 63 Ohio App.3d 271, 578 N.E.2d 556, 561 (1991); *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 777 A.2d 442, 446 (2001); *Zarella v. Minn. Mut. Life Ins. Co.,* No. CIV A 96–2782, 1999 WL 226223, at *9 (R.I.Super.Apr.14, 1999); *State Indus., Inc. v. Fain,* 38 S.W.3d 167, 172–73 (Tex.App.-Waco 2000, pet. denied); *see also Wash. Mut. Bank, FA v. Super. Ct.,* 24 Cal.4th 906, 103 Cal.Rptr.2d 320, 15 P.3d 1071, 1077 (2001) *But see Cheminova Am. Corp. v. Corker,* 779 So.2d 1175, 1183 (Ala.2000); *Avery v. State Farm Mut. Auto. Ins. Co.,* 321 Ill.App.3d 269, 254 Ill.Dec. 194, 746 N.E.2d 1242, 1254 (2001); *Hinshaw v. AT & T Corp.,* No. 29D01 9705–CP–000308, 1998 WL 1799019, at *23 (Ind.Super.Ct. Aug. 24, 1998); *Delgozzo v. Kenny,* 266 N.J.Super. 169, 628 A.2d 1080, 1092, 1094 (1993); *Lobo Exploration Co. v. Amoco Prod. Co.,* 991 P.2d 1048, 1055 (Okla. Civ.App.1999). *See* Rory Ryan, *Uncertifiable?: The Current Status of Nationwide State-Law Class Actions,* 54 BAYLOR L. REV. 467, 471 & n. 6 (Spring 2002) (collecting cases).

**92.** *Stirman v. Exxon Corp.,* 280 F.3d 554, 564–66 (5th Cir.2002); *Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1187 (9th Cir. 2001); *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 678 (7th Cir.2001); *In re LifeUSA Holding, Inc.,* 242 F.3d 136, 147 (3d Cir. 2001); *Spence v. Glock,* 227 F.3d 308, 316 (5th Cir.2000); *Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1025 (11th Cir.1996); *Castano v. American Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996); *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 617 (3d Cir.1996), *aff'd sub nom. Amchem Prods. Inc. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1089 (6th Cir.1996); *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1302 (7th Cir. 1995); *Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1010–11 (D.C.Cir.1986); *In re Citigroup, Inc.,* No. CIV.A.10011912REK, 2001 WL 1682865, at *3 (D.Mass. Dec.19, 2001); *Hammett v. Am. Bankers Ins. Co.,* 203 F.R.D. 690, 700–02 (S.D.Fla.2001); *Duncan v. N.W. Airlines, Inc.,* 203 F.R.D. 601, 605, 610–14 (W.D.Wash.2001); *Neely v. Ethicon, Inc.,* No. 1:00–CV–00569, 2001 WL 1090204, at *8–11, 15 (E.D.Tex. Aug. 15, 2001); *Begley v. Academy Life Ins. Co.,* 200 F.R.D. 489, 497 (N.D.Ga.2001); *Oxford v. Williams Cos., Inc.,* 137 F.Supp.2d 756, 764 (E.D.Tex.2001); *Jones v. Allercare, Inc.,* 203 F.R.D. 290, 308 (N.D.Ohio 2001); *Stipelcovich v. Directv, Inc.,* 129 F.Supp.2d 989, 995 (E.D.Tex.2001); *Shelley v. AmSouth Bank,* No. CIV.A.97–1170–RV–C, 2000 WL 1121778, at *8–10 (S.D.Ala. July 24, 2000); *Lyon v. Caterpillar, Inc.,* 194 F.R.D. 206, 220–23 (E.D.Pa.2000); *Adams v. Kan. City Life Ins. Co.,* 192 F.R.D. 274, 277–78 (W.D.Mo.2000); *Hallaba v. Worldcom Network Servs. Inc.,* 196 F.R.D. 630, 645 (N.D.Okla.2000); *Velasquez v. Crown Life Ins. Co.,* MDL–1096 No. CIV.A.M–97–064, 1999 WL 33305652, at *4–7 (S.D.Tex. Aug. 10, 1999); *Clay v. Am. Tobacco Co.,* 188 F.R.D. 483, 497–98, 503 (S.D.Ill.1999); *Carpenter v. BMW of N. Am., Inc.,* No. 99–CV–214, 1999 WL 415390, at *4, *8 (E.D. Pa. June 21, 1999); *Chilton Water Auth. v. Shell Oil Co.,* No. CIV.A.98–T–1452–N, 1999 WL 1628000, at *8 (M.D.Ala. May 21, 1999); *Powers v. Gov't Employees Ins. Co.,* 192 F.R.D. 313, 319–20 (S.D.Fla.1998); *Rothwell v. Chubb Life Ins. Co. of Am.,* 191 F.R.D. 25, 33 n. 7 (D.N.H.1998); *Dhamer v. Bristol–Myers Squibb Co.,* 183 F.R.D. 520, 532–34 (N.D.Ill. 1998); *Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 402–03 (D.N.J.1998); *In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 225 (W.D.Mich.1998); *Chin v.*

overwhelmingly rejected class certification when multiple states' laws must be applied. For this reason, the plaintiffs have failed to show that legal issues predominate.

## V

■ Finally, Schein argues that the plaintiffs have not demonstrated that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy"[93] as Rule 42(b)(4) requires. We agree.

The court of appeals did not discuss whether a class action here is superior to the pursuit of individual claims. The trial court alluded to the requirement in a single sentence:

> In light of the amount any individual Plaintiff could recover in this case and the fact that Plaintiffs are owners and operators of small businesses, the Court finds that the economics of pursuing their claims individually would not be feasible for the members of both the DOS and Windows subclasses.

We are not persuaded that the amount of recovery is so small as to prohibit individual claims. The plaintiffs have specifically pleaded that they will limit their recovery to $74,000 so as to avoid removal to federal court, strongly suggesting that individual recoveries could exceed that figure. Coun-

*Chrysler Corp.*, 182 F.R.D. 448, 465 (D.N.J. 1998); *Marascalco v. Int'l Computerized Orthokeratology Soc'y, Inc.*, 181 F.R.D. 331, 340–41 (N.D.Miss.1998); *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 222–26 (E.D.La.1998); *Fisher v. Bristol–Myers Squibb Co.*, 181 F.R.D. 365, 368 (N.D.Ill.1998); *Poe v. Sears, Roebuck & Co., Inc.*, 1 F.Supp.2d 1472, 1476 (N.D.Ga.1998); *Borskey v. Medtronics*, No. CIV.A.94–2302, 1998 WL 122602, at *3 (E.D.La. Mar. 18, 1998); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 496–99, 502 (N.D.Ill.1998); *Peoples v. Am. Fidelity Life Ins. Co.*, 176 F.R.D. 637, 646 (N.D.Fla.1998); *In re Ford Motor Co. Bronco II Prod. Liab. Litig.*, 177 F.R.D. 360, 376 (E.D.La.1997); *Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 23 & nn. 10–12 (D.Conn.1997); *Dubose v. First Sec. Sav. Bank*, 183 F.R.D. 583, 587 (M.D.Ala.1997); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 347–52 (D.N.J.1997); *In re Stucco Litig.*, 175 F.R.D. 210, 219 (E.D.N.C.1997); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 100 (W.D.Mo.1997); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 341–42 (N.D.Ill.1997); *In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.*, 170 F.R.D. 417, 422–27 (E.D.La.1997); *Mack v. Gen. Motors Acceptance Corp.*, 169 F.R.D. 671, 679 (M.D.Ala.1996); *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 631–633 (D.Kan.1996); *Barbarin v. Gen. Motors Corp.*, No. CIV.A.84–0888, 1993 WL 765821, at *3 (D.D.C. Sept. 22, 1993); *Raye v. Medtronic Corp.*, 696 F.Supp. 1273, 1275 (D.Minn.1988); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 608 (S.D.N.Y.1982). *But see In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 290 (3d Cir.1998) (settlement class); *In re School Asbestos Litig.*, 789 F.2d 996, 1011 (3d Cir.1986); *Rivera v. Wyeth–Ayerst Labs.*, 197 F.R.D. 584, 591–92 (S.D.Tex.2000), *rev'd on other grounds*, 283 F.3d 315 (5th Cir.2002); *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 222 (N.D.Tex.2000); *Dornberger v. Metro. Life Ins. Co.*, 182 F.R.D. 72, 77–79 (S.D.N.Y.1998); *Elkins v. Equitable Life Ins. of Iowa*, No. CIV.A.96–296–Civ–T–17B, 1998 WL 133741, at *18 (M.D.Fla. Jan. 27, 1998); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 294 (S.D.Ohio 1997); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 464–66 (D.Wyo.1995); *In re Cordis Corp. Pacemaker Prod. Liab. Litig.*, No. MDL 850, C3–86–543, 1992 WL 754061, at *13–16 (S.D.Ohio Dec.23, 1992); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 84–85 (D.Md.1991); *Randle v. SpecTran*, 129 F.R.D. 386, 393 (D.Mass.1988); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 82–83 (E.D.Pa.1987); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 22 (N.D.Cal.1986); *In re LILCO Sec. Litig.*, 111 F.R.D. 663, 674 (E.D.N.Y.1986); *In re Activision Sec. Litig.*, 621 F.Supp. 415, 430–31 (N.D.Cal.1985). *See* Ryan, *supra* note 91, at 470 & n. 5 (collecting cases).

**93.** Tex.R. Civ. P. 42(b)(4).

sel for the Windows subclass advised us at oral argument that most of the plaintiffs paid "no more than $10,000, and more like $5,000–$8,000 for each software product that was sold to them." Exemplary or additional damages might double or triple that number. In addition, Texas law allows recovery of reasonable attorney fees in contract and DTPA actions. There is nothing to indicate that many individual claims are not worth pursuing. We cannot find in the record any basis for the trial court's conclusion that claims of the size indicated would not be prosecuted individually simply because the plaintiffs are small businesses.

But there is another, more important reason why the plaintiffs have failed to satisfy the superiority requirement of Rule 42(b)(4), and that is that they have failed to show that a class action is either more fair or more efficient in these circumstances. As the Seventh Circuit cogently explained in *Bridgestone:*

> Efficiency is a vital goal in any legal system—but the vision of "efficiency" underlying this class certification is the model of the central planner. Plaintiffs share the premise of the ALI's *Complex Litigation Project* (1993), which devotes more than 700 pages to an analysis of means to consolidate litigation as quickly as possible, by which the authors mean, before multiple trials break out. The authors take as given the benefits of that step. Yet the benefits are elusive. The central planning model—one case, one court, one set of rules, one settlement price for all involved—suppresses information that is vital to accurate resolution. What *is* the law of Michigan, or Arkansas, or Guam, as applied to this problem? Judges and lawyers will have to guess, because the central

planning model keeps the litigation far away from state courts. (Ford asked us to certify legal questions to the Supreme Court of Michigan, to ensure that genuine state law was applied if Michigan's law were to govern the whole country; the plaintiffs stoutly resisted that proposal.) And if the law were clear, how would the facts (and thus the damages per plaintiff) be ascertained? One suit is an all-or-none affair, with high risk even if the parties supply all the information at their disposal. Getting things right the first time would be an accident. Similarly Gosplan or another central planner *may* hit on the price of wheat, but that would be serendipity. Markets instead use diversified decision-making to supply and evaluate information. Thousands of traders affect prices by their purchases and sales over the course of a crop year. This method looks "inefficient" from the planner's perspective, but it produces more information, more accurate prices, and a vibrant, growing economy. See Thomas Sowell, *Knowledge and Decisions* (1980). When courts think of efficiency, they should think of market models rather than central-planning models.[94]

We fully agree and think the same observations are appropriate in the present case.

\* \* \* \* \* \*

The judgment of the court of appeals must be reversed. We cannot say, of course, that no class can be certified in this case; that matter must be decided by the trial court in the first instance.[95] We conclude only that the certification order before us is improper. The case is therefore

---

**94.** 288 F.3d at 1020.

**95.** *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398, 406 (Tex.2000).

remanded to the trial court for further proceedings.

Justice O'NEILL filed a dissenting opinion, in which Justice ENOCH and Justice HANKINSON joined.

Justice SCHNEIDER did not participate in the decision.

Justice O'NEILL, dissenting.

By their nature, class-certification decisions present complex and important issues. On one hand, the class-action device affords an avenue for relief to large numbers of people who might not otherwise be able to pursue individual claims; on the other hand, the decision to certify a class can have staggering economic consequences. These concerns would, perhaps, justify our interlocutory review of class-certification orders should the Texas Legislature decide to grant us jurisdiction to do so. But as it stands, the Legislature has chosen to limit our jurisdiction over interlocutory appeals like this one unless the court of appeals' decision conflicts with a prior decision of this court or another court of appeals. *Deloitte & Touche, LLP v. Fourteenth Court of Appeals,* 951 S.W.2d 394, 396 (Tex.1997); TEX. GOV'T CODE §§ 22.001(a)(2), 22.225(b), 22.225(c); TEX. CIV. PRAC. & REM.CODE § 51.014(a)(3). Frustrated by this constraint, the Court distorts well-established conflicts jurisprudence to usurp the very power that the Legislature has deliberately denied. While I appreciate the Court's frustration, the important issues this case presents cannot override due respect for precedent and legislative boundaries. Because we do not have jurisdiction to reach the merits of the trial court's certification order, I dissent.

## I

Jurisdiction over interlocutory appeals is generally final in the courts of appeals, absent an express constitutional or legislative grant. TEX. GOV'T CODE §§ 22.225(b), 22.001(a)(2); *Coastal Corp. v. Garza,* 979 S.W.2d 318, 319 (Tex.1998). The Legislature has vested jurisdiction in this Court when, among other instances not pertinent here, "one of the courts of appeals holds differently from a prior decision of another court of appeals or of the supreme court on a question of law material to a decision of the case." TEX. GOV'T CODE § 22.001(a)(2); *see also* TEX. GOV'T CODE § 22.225(c).

We have often noted how " 'difficult [it is] to establish conflicts jurisdiction' " under this limited legislative grant. *Garza,* 979 S.W.2d at 319 (quoting *Gonzalez v. Avalos,* 907 S.W.2d 443, 444 (Tex.1995) (citing *Christy v. Williams,* 156 Tex. 555, 298 S.W.2d 565, 567 (1957))). While complete factual identity is not required, for this Court to have conflicts jurisdiction "it must appear that the rulings in the two cases are 'so far upon the same state of facts that the decision of one case is necessarily conclusive of the decision in the other.' " *Id.* at 319 (quoting *Gonzalez,* 907 S.W.2d at 444). Further, " '[t]he conflict must be on the very question of law actually involved and determined ... the test being whether one would operate to overrule the other in case they were both rendered by the same court.' " *Garza,* 979 S.W.2d at 319–20 (quoting *Christy,* 298 S.W.2d at 568–69 (quoting *West Disinfecting Co. v. Trs. of Crosby Indep. Sch. Dist.,* 135 Tex. 492, 143 S.W.2d 749, 750 (1940))). It is this strict standard that governs our conflicts analysis.

## II

The Court concludes that the court of appeals' opinion conflicts with our decision in *Southwestern Refining Co. v. Bernal,* 22 S.W.3d 425, 435 (Tex.2000), because the

trial court's order does not specifically state how the class members' damages will be resolved. But the court of appeals' opinion in this case does not conflict with *Bernal* on this point.

In *Bernal*, we considered an order that certified a class of more than 900 personal injury claims arising from a refinery explosion. The order proposed a three-phase trial plan in which the defendant's liability on various theories, including gross negligence, would be adjudicated first. *Id.* at 429. Phase II would address punitive damages, and Phase III would determine whether individual class members could show sufficient specific injuries or damages and whether they were proximately caused by the explosion. *Id.* Punitive damages determined in Phase II would then be reduced in proportion to the number of individuals who could not demonstrate actual damages or proximate cause in Phase III. *Id.* The court of appeals modified the trial plan to require proof of the class representatives' actual damages before determining punitive damages. *Southwestern Refining Co. v. Bernal*, 960 S.W.2d 293, 298–99 (Tex.App.-Corpus Christi 1997), *reversed*, 22 S.W.3d 425 (Tex.2000). In evaluating the predominance requirement for certification under Rule 42(b)(4), the court of appeals failed to consider whether common issues would predominate throughout the entire trial. Instead, the court looked at each phase separately and determined that common issues would predominate in two phases of the trial, while individual issues would only predominate in determining causation and damages. *Id.* at 299. Considering this showing sufficient for predominance purposes, and going so far as to suggest that separate juries could be summoned to resolve the individual issues, the court of appeals affirmed the certification order as modified. *Bernal*, 22 S.W.3d at 429 (citing 960 S.W.2d at 297, 299).

This Court has previously held that the differences between personal injury classes and non-personal injury classes are so significant as to defeat conflicts jurisdiction. *Coastal*, 979 S.W.2d at 321 ("Because this case does not involve certification of personal injury claims, we cannot say that the decisions are in conflict on a material question of law such that this Court has conflict jurisdiction."). That is because "[p]ersonal injury claims will often present thorny causation and damage issues with highly individualistic variables that a court or jury must individually resolve," such as, in that case, "each class member's dosage, location, activity, age, medical history, sensitivity, and credibility." *Bernal*, 22 S.W.3d at 436, 437. The Court does not even attempt to explain why this distinction that defeated conflicts jurisdiction in *Coastal* does not apply here. Instead, the Court ignores significant factual and legal differences between this case and *Bernal* and grounds its conflicts analysis on nothing more than disagreement with the court of appeals' result. This has never been sufficient to invoke our interlocutory-appeal jurisdiction, until today.

But even if *Bernal's* toxic exposure/personal injury context does not distinguish it from this case, the court of appeals' decision here is not so far upon the same set of facts as to overrule *Bernal*. In this case, the court of appeals did not endorse the "certify now and worry later" approach that the lower courts followed and we disavowed in *Bernal*. Instead, it affirmed based upon a detailed examination of the extensive trial court record. The record from the five-day certification hearing consists of twelve bound volumes of documents containing over 180 exhibits, and six volumes of testimony and argument. The trial court made extensive findings enumerating the issues common to the class,

which center around the same alleged contract breaches, the same alleged software and operational defects, the same misrepresentations, and the same scheme of sending and billing class members for unsolicited software. The court considered Schein's argument that individual issues, including the determination of consequential damages, would overshadow these common issues, but concluded that the primary damage measure was disgorgement of the software's purchase price, the amount of which was easily determinable from Schein's own records. The court recognized that there may be other sources of consequential damages, but concluded that "the damages issue will not require the time-consuming, individualized inquiries that Easy Dental predicts." 28 S.W.3d at 206. Unlike the court of appeals in *Bernal*, the court here considered the entire trial proceedings, made no suggestion that separate juries might be required to resolve individual damage issues, and determined that "proof-of-claim forms, individual damage hearings, or other manageable means" could be utilized in the event consequential damages were sought on some claims. *Id.* at 207.

The court of appeals' conclusion that common issues will predominate may or may not ultimately bear out. But the court of appeals "carefully scrutiniz[ed] the predominance standard to ensure that the proposed class is 'sufficiently cohesive to warrant adjudication by representation,'" as *Bernal* mandates. *Bernal*, 22 S.W.3d at 435 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Its decision would not operate to overrule *Bernal*, and therefore it cannot provide a basis for conflicts jurisdiction.

## III

Having crafted a conflict upon which to base jurisdiction, the Court is then free to

consider all issues in the case. *Brown v. Todd*, 53 S.W.3d 297, 301 (Tex.2001). Rather than proceeding to do so, however, the Court gratuitously identifies an additional purported conflict with *Bernal* based upon the review standard the court of appeals articulated in this case. But even a cursory review of the two opinions reveals the weakness of the Court's conflicts analysis on this point. Moreover, the Court's unnecessary treatment of this issue, albeit dicta, starkly illustrates its desire to expand our interlocutory-appeal jurisdiction beyond the clear parameters the Legislature has imposed.

In this case, in a section entitled "Standard of Review," the court of appeals recited the abuse-of-discretion review standard that applies to class-certification decisions. 28 S.W.3d at 201. In the course of that discussion, the court states: "In our review of the trial court's decision, we view the evidence in the light most favorable to the trial court's action and entertain every presumption in favor of its judgment." *Id.* In *Bernal*, we identified a variety of less-than-rigorous approaches some appellate courts had taken in evaluating the predominance requirement for class certification, including an approach whereby the court "indulged every presumption in favor of the trial court's ruling, viewed the evidence in the light most favorable to that ruling, and frankly acknowledged that if they erred, it would be in favor of certification." 22 S.W.3d at 434. We rejected this and other "certify now and worry later" approaches to predominance in favor of a more "rigorous analysis." *Id.* at 434–35. But in reviewing the trial court's certification order under this principle, we applied an abuse of discretion standard, just as the court of appeals did here. *Id.* at 439. There is nothing in the court of appeals' opinion in this case to suggest that the court was uncertain about predominance

and erred in favor of certification. To the contrary, the court cited *Bernal* for the proposition that "'a cautious approach to class certification is essential,'" and acknowledged that "'[i]f it is not determinable from the outset that the individual issues can be considered in a manageable, time-efficient, yet fair manner, then certification is not appropriate.'" 28 S.W.3d at 204 (quoting *Bernal*, 22 S.W.3d at 435). The court then proceeded to perform an independent predominance analysis, concluding that individualized issues did not predominate. *Id.* at 204–08.

The court of appeals' description of the standard of review does not conflict with the review standard we recited in *Bernal*. And even if it did, we have long recognized that inconsistent statements are not sufficient for conflicts jurisdiction. *See Gonzalez*, 907 S.W.2d at 444 (quoting *Christy*, 298 S.W.2d at 567); *see also Collins v. Ison–Newsome*, 73 S.W.3d 178, 185 (Tex. 2001) (JEFFERSON, J., concurring) (citing *Gonzalez*, 907 S.W.2d at 444 (quoting *Christy*, 298 S.W.2d at 567)). The court of appeals' articulation of the review standard simply does not conflict with *Bernal* "'on the very question of law actually involved and determined,'" and thus cannot invoke our jurisdiction over this interlocutory appeal. *Bernal*, 22 S.W.3d at 430 (quoting *Coastal*, 979 S.W.2d at 329–20).

## IV

Schein also contends that we have jurisdiction based upon a conflict with *Checker Bag Co. v. Washington*, 27 S.W.3d 625 (Tex.App.-Waco 2000, pet. denied). I disagree. In this case, the court of appeals states in a footnote that "[c]onsumers are not required to prove reliance in order to recover for misrepresentations under the DTPA." 28 S.W.3d at 206 n. 9. In *Checker Bag*, the court of appeals observed that a plaintiff in a DTPA laundry-list suit must establish that the defendant engaged in a false, misleading, or deceptive act on which the plaintiff relied. *Checker Bag*, 27 S.W.3d at 634. Undoubtedly, these two statements are diametrically opposed. But we have long recognized that inconsistent statements are not sufficient to establish conflicts jurisdiction. *See Gonzalez*, 907 S.W.2d at 444 (quoting *Christy*, 298 S.W.2d at 567). Instead, our conflicts jurisdiction arises only if one court holds differently from another on a question of law material to deciding the case. TEX. GOV'T CODE § 22.001(a)(2). To meet that standard, the two decisions must conflict on "'the very question of law *actually involved and determined.*'" *Garza*, 979 S.W.2d at 319 (emphasis added) (quoting *Christy*, 298 S.W.2d at 568–69); *see Collins*, 73 S.W.3d at 185 (citing *Gonzalez*, 907 S.W.2d at 444 (quoting *Christy*, 298 S.W.2d at 567)); *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 552 (Tex.2000).

I am not sure that I agree with Schein that the court of appeals' statement in this case about reliance was material to its decision. In discussing the predominance requirement, the court noted that

[t]he depositions and documentary evidence comprising the bulk of the record directly relate to ... the nature of the defects in Easy Dental's software, the extent of Easy Dental's knowledge of those defects, Easy Dental's alleged uniform misrepresentations about the software and the technical support that it would provide, and Easy Dental's alleged common scheme of sending and billing class members for unsolicited software [and that] these common issues are the most heavily disputed and will be the focus of most of the trial court's and parties' efforts.

28 S.W.3d at 205. The court emphasized that the plaintiffs seek disgorgement of the software's purchase price as their pri-

mary damages measure and assert fraud and DTPA claims solely to recover exemplary damages. *Id.* at 206–07. Given that analysis, whether the court's footnote about reliance was material to its decision is questionable.

What is clear, however, is that the *Checker Bag* court's statement about reliance was not material to its decision and is dictum. There, the court noted that, to succeed in a DTPA laundry-list suit, a plaintiff must show that "(1) he is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, (3) on which the plaintiff relied, and (4) these acts constituted a producing cause of the consumer's damages." *Checker Bag,* 27 S.W.3d at 634 (citing TEX. BUS. & COM.CODE § 17.50(a)(1)). The defendant challenged the factual sufficiency of the evidence to support reliance, but the court held that the defendant had not preserved error and declined to address defendant's sufficiency challenge. *Checker Bag,* 27 S.W.3d at 635. Thus, it was unnecessary for the *Checker Bag* court to consider, nor did it consider, the reliance element's relation to the plaintiff's claims in the case. *See St. Paul Surplus Lines Ins. Co., Inc. v. Dal–Worth Tank Co., Inc.,* 974 S.W.2d 51, 53 (Tex. 1998) (holding that defendant waived error "and thus [we] need not consider [the substantive issue]."); *Keetch v. Kroger Co.,* 845 S.W.2d 262, 267 (Tex.1992) (holding that, because error was not preserved, "we need not decide whether failure to submit in broad form was reversible error."). Clearly, the court's recitation of the DTPA laundry-list elements was immaterial to its decision and was not a holding that would operate to overrule the court of appeals' decision in this case. Consequently, *Checker Bag* does not present a conflict with this case for jurisdictional purposes.

## V

Schein also argues that the court of appeals' decision conflicts with *Daughety v. National Association of Homebuilders of the United States,* 970 S.W.2d 178 (Tex. App.-Dallas 1998, no pet.). In *Daughety,* the court of appeals affirmed an order denying class certification. *Id.* at 182. Although the plaintiffs had sought to certify a nationwide class on several causes of action, they argued on appeal that the trial court should have certified a class on a single claim. *Id.* The court of appeals affirmed the trial court's order because the plaintiffs had never presented the trial court with an opportunity to rule on a single-claim class. *Id.*

Schein contends that this case conflicts with *Daughety* because the court of appeals "affirmed by effectively narrowing Plaintiffs' claims, ignoring some, and holding that fraud was 'ancillary to and subsumed by appellees' DTPA claims.'" But the court of appeals did not certify a class different than the one before the trial court; instead, in considering predominance, it merely reasoned that the majority of the litigants' efforts would be focused upon breach-of-contract questions. 28 S.W.3d at 206–07. The two opinions do not conflict on "'the very question of law actually involved and determined.'" *Bernal,* 22 S.W.3d at 430 (emphasis added) (quoting *Garza,* 979 S.W.2d at 319).

## VI

Schein also asserts that the court of appeals' opinion conflicts with our decision in *Intratex Gas Co. v. Beeson,* 22 S.W.3d 398 (Tex.2000), because the court "changed the nature of the certification order by ruling that 'reliance' was unimportant to the analysis of Rule 42(b)(4) and was not a common question, because the reliance-dependent claims were 'ancillary to and subsumed by' the DTPA claim." But contrary to Schein's characterization, the court of

appeals did not rule that reliance was unimportant to the Rule 42(b)(4) analysis or was not a common issue. The court simply concluded that reliance would not be an individualized issue that would defeat predominance. 28 S.W.3d at 206–07. In reaching that conclusion, the court did not redefine the class, which we cautioned against in *Intratex*. *Intratex*, 22 S.W.3d at 406. The court of appeals' opinion does not conflict with our decision in *Intratex*.

### VII

Finally, Schein argues that the court of appeals' opinion conflicts with *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979), because sections 6 and 145 of the Restatement (Second) of Conflicts of Law, which we adopted in that case, "do not mention the parties' contractual relationship as a factor—much less the controlling factor for determining the state with the most significant relationship to the case." The court of appeals' decision in this case, however, falls far short of overruling *Gutierrez*. In *Gutierrez*, we held that the most-significant-relationship test set out in sections 6 and 145 of the Restatement (Second) of Conflicts would apply in all future tort cases. *Gutierrez*, 583 S.W.2d at 318. We concluded that the law of Texas would likely apply to a case involving Texas residents, even though the case arose from an accident in Mexico. *Id.* at 319. In this case, the court applied the most-significant-relationship test set out in the Restatement and *Gutierrez*, and concluded that Texas law applied to the class members' contract claims. 28 S.W.3d at 208–09. The court then concluded that Texas law should apply to the class members' tort claims because those claims arise from the parties' contractual relationship. *Id.* at 209. The case before us does not conflict with *Gutierrez*.

### VIII

While Schein raises important issues concerning the trial court's certification order which may or may not have merit, we cannot ignore the limits the Legislature has placed on our jurisdiction. The author of today's decision has consistently, but unsuccessfully, advocated a broader approach to conflicts jurisdiction. *See Collins*, 73 S.W.3d at 185–93 (Tex.2001); *Garza*, 979 S.W.2d at 322–26 (HECHT, J., dissenting); *Wagner & Brown, Ltd. v. Horwood*, 53 S.W.3d 347, 349–51 (HECHT, J., dissenting from denial of motion for rehearing of petition for review). A majority of the Court has heretofore resisted the call to abandon precedent and expand the legislative constraints on our jurisdiction. Today, inexplicably, the majority yields. Because I do not believe that our conflicts jurisprudence supports jurisdiction in this case, I dissent.